IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:14-CV-00425-FL

| | |
|---|---|
| PONCHITA COTTON, ) | |
| ) | |
| Plaintiff/Claimant, ) | |
| ) | |
| ) | **MEMORANDUM AND** |
| v. ) | **RECOMMENDATION** |
| ) | |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

This matter is before the court on the parties' cross-motions for judgment on the pleadings [DE-16, DE-22] pursuant to Fed. R. Civ. P. 12(c). Claimant Ponchita Cotton ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3) seeking judicial review of the denial of her applications for a period of disability, Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") payments. The time for filing responsive briefs has expired and the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, it is recommended that Claimant's Motion for Judgment on the Pleadings be allowed, Defendant's Motion for Judgment on the Pleadings be denied, and the case be remanded to the Commissioner for further proceedings consistent with the Memorandum and Recommendation.

## I. STATEMENT OF THE CASE

Claimant protectively filed applications for SSI on September 7, 2011, and filed an application for a period of disability and DIB on September 19, 2011, alleging disability beginning October 15, 2007. (R. 29, 187-200). Both claims were denied initially and upon reconsideration.

(R. 66-106). A hearing before the Administrative Law Judge ("ALJ") was held on April 4, 2013, at which Claimant was represented by counsel and a vocational expert ("VE") appeared and testified. (R. 44-65). On April 17, 2013, the ALJ issued a decision denying Claimant's request for benefits. (R. 26-43). Claimant then requested a review of the ALJ's decision by the Appeals Council (R. 21), and submitted additional evidence as part of her request (R. 8-13, 279). After reviewing and incorporating the additional evidence into the record, the Appeals Council denied Claimant's request for review on May 29, 2014. (R. 1-7). Claimant then filed a complaint in this court seeking review of the now-final administrative decision.

## II. STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996), *superseded*

*by regulation on other grounds*, 20 C.F.R. § 416.927(d)(2)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

### III. DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth in 20 C.F.R. §§ 404.1520, 416.920 under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (citation omitted). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. §§ 404.1520a(b)-(c) and 416.920a(b)-(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *Id.* §§ 404.1520a(c)(3), 416.920a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id.* §§ 404.1520a(e)(3),

3

416.920a(e)(3).

In this case, Claimant alleges that the ALJ erred by failing to evaluate permanent limitations assessed by a treating physician and in evaluating Claimant's RFC. Pl.'s Mem. Supp. Pl.'s Mot. J. Pleadings ("Pl.'s Mem.") [DE-17] at 8-12.

## IV. FACTUAL HISTORY

### A.    ALJ's Findings

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant was no longer engaged in substantial gainful employment. (R. 31). Next, the ALJ determined Claimant had the following severe impairments: arthritis of the left knee, hypertension, diabetes mellitus, and obesity. *Id.* However, at step three, the ALJ concluded these impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.*

Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the ability to perform light work[1] with the ability to sit, stand, and walk for six hours in an eight-hour workday, requiring "a work environment that would permit her to change between sitting and standing positions at least once an hour (i.e. a "sit/stand option"). She can climb, balance, stoop, kneel, crouch, and crawl occasionally. She should avoid exposure to workplace hazards such as

---

[1] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If an individual can perform light work, he or she can also perform sedentary work, unless there are additional limiting factors such as the loss of fine dexterity or the inability to sit for long periods of time. 20 C.F.R. §§ 404.1567(b), 416.967(b).

4

unprotected heights and dangerous machinery." (R. 32). In making this assessment, the ALJ found Claimant's statements about her limitations not fully credible. (R. 35-36).

At step four, the ALJ concluded Claimant did not have the RFC to perform the requirements of her past relevant work as a school bus driver, teacher's assistant, child day care worker, and shipping clerk. (R. 36). Nonetheless, at step five, upon considering Claimant's age, education, work experience and RFC, the ALJ determined Claimant is capable of adjusting to the demands of other employment opportunities that exist in significant numbers in the national economy. (R. 37).

## B. Claimant's Testimony at the Administrative Hearing

At the time of Claimant's administrative hearing, Claimant was 43 years old and unemployed, living with her husband and two adult children (ages 18 and 19). (R. 46-47). Claimant is a high school graduate and attained certification in day care and child care development. (R. 47). Claimant was last employed with the Franklin County Schools as a teaching assistant and bus driver for approximately seven years, ending in October 2007, where her duties included driving a bus route and physically assisting special needs children by taking them to the bathroom and keeping them seated and on task. (R. 48). Claimant also worked as a pre-school teacher in a daycare for six years, where she taught children and helped them prepare for kindergarten. *Id.* Claimant also worked as a shipping clerk in the early 1990s for four or five years, scanning labels of products to be loaded on trucks and distributed. (R. 49-50). Claimant testified that she tried to go back to work in January 2008 as an infant room teacher in a day care, but only lasted three months because of her knee problems. (R. 49). At that position, Claimant had to get down on the floor with the children and take them outside in strollers to walk, which she was unable to do. *Id.*

Claimant testified that she is unable to work due to her left knee pain. (R. 50). In 2004,

5

Claimant was running after a special needs student and twisted her left knee into her right knee. (R. 50-51). Claimant has had several different surgeries on her left knee. (R. 50). Dr. Burt at Orthopedic Specialists performed the first surgery in October of 2004, to repair torn cartilage in Claimant's knee. (R. 50-51). The first surgery did not help Claimant's pain, and six months later, Dr. Burt performed a second surgery to remove Claimant's kneecap, after which Claimant had six months of physical therapy. *Id.* Claimant testified that she has had pain in her knee ever since. (R. 51). In 2008, Dr. Burt performed another surgery on Claimant's knee, to scope it and remove scar tissue buildup. (R. 51-52). Claimant then had a fourth surgery with Dr. Galland of North Carolina Orthopedic Specialists, whom she still sees, to repair a torn ACL, meniscus, and a bone spur. (R. 52). After the fourth surgery, Claimant again had six months of physical therapy. *Id.*

Since her last surgery, Claimant has had steroid injections and Euflexxa injections (to build up muscle fluid since Claimant's kneecap was removed), but Claimant testified that these treatments have not worked and made her pain worse. *Id.* Claimant feels like her left knee is now worse than it was before her first surgery. (R. 52-53). According to Claimant Dr. Galland is at a "standpoint" because he does not think Claimant would be able to walk again if he performed a total knee replacement. (R. 53). Claimant started pain management a month before the hearing with Dr. Patel at North Carolina Orthopedic Specialists, and takes hydrocodone daily and tramadol every four hours. (R. 53-54). Claimant testified that these medications help with her pain but they make her sleepy. (R. 54). The medications do not take away her pain entirely, but they enable Claimant to relax during the day. *Id.*

Claimant experiences constant swelling in her knee. *Id.* At night, she sleeps with it elevated on a pillow, and during the day, Claimant keeps her knee elevated on the couch above her heart level.

6

*Id.* Both Dr. Burt and Dr. Galland recommend that Claimant keep her knee elevated to reduce the swelling. (R. 55). Claimant's doctors also recommended that she use a cane, which she always takes with her if she is leaving the house. *Id.* Claimant has worn a full-leg brace since 2004, which requires her to keep her leg straight when she is sitting. (R. 55-56). Claimant testified that before her injury, she could walk a mile, but now it hurts to even walk to the bathroom and she could not walk a block. (R. 56). Claimant testified that it hurts to stand still, and does not think she could stand for more than five minutes. *Id.* Claimant is unable to sit comfortably, and has to lean forward because of the metal rods in her knee brace. (R. 56-57). Claimant's knee still buckles even though she uses her cane, and she last fell the Sunday before the hearing. (R. 57).

Claimant has diabetes, for which she takes metformin twice a day, and checks her blood sugar during the day. (R. 58). On a good day, her blood sugar will be 135. *Id.* In January of 2012, Claimant had a mass surgically removed from her breast. (R. 58-59). It was not cancerous, but Claimant had MRSA, which took two months to heal. *Id.*

Claimant testified that she cannot do any exercises with her knee because of her pain. (R. 59). It hurts to bend her knee, so she can only sleep on her back with her knee elevated. *Id.* On a typical day, Claimant sits on her couch with her knee elevated. *Id.* Claimant's husband does the cooking, cleaning, and laundry. (R. 59-60). Claimant's husband usually drives her places, although Claimant still has a driver's license and drives from her house to her mother's house (which takes five minutes). (R. 60). Claimant's husband drove the 45 minutes to the hearing, which Claimant would not be able to do. *Id.* Claimant goes grocery shopping with her husband and her children. *Id.* Claimant washes at the sink because she has trouble standing in the shower or getting out of the tub without help. *Id.* Claimant testified that she was a hard worker and was only injured because

7

she was doing her job. (R. 61).

## C.  Vocational Expert's Testimony at the Administrative Hearing

Julie Sawyer-Little testified as a VE at the administrative hearing. (R. 61-63). After the VE's testimony regarding Claimant's past work experience (R. 61), the ALJ asked the VE to assume a hypothetical individual of the same age, education and prior work experience as Claimant and posed two hypothetical questions. First, the ALJ asked what jobs the individual could perform assuming the individual has the physical capacity to "occasionally lift 20 pounds, frequently lift 10 pounds, can sit, stand and walk six hours each in an eight-hour workday but requires a sit/stand position, a sit/stand option with a change of position at least once an hour, can occasionally climb, balance, stoop, kneel, crouch, crawl and must avoid hazards such as heights and heavy machinery." (R. 62). The VE responded that such an individual could perform the following jobs: cashier II (DOT # 211.462-010, light, SVP-2); office helper (DOT # 239.567-010, light, SVP-2); and marker (DOT # 209.587-034, light, SVP-2). *Id.* The ALJ then asked whether a person with all of the impairments and related limitations as testified to by Claimant would be able to perform any work, to which the VE responded in the negative. *Id.* The VE stated that her testimony was consistent with the DOT, except for the sit/stand information, which was based on her training, experience, consultation work, performing job task analysis, and listening to testimony about how work is actually performed. *Id.*

Claimant's attorney inquired whether the first hypothetical would be impacted if the following limitation were added: the need to elevate the leg to waist level 10 to 15 minutes every couple of hours at unscheduled break times. (R. 63). The VE responded that all work would be precluded. *Id.* Claimant's attorney also inquired whether the need to use a cane while standing or

8

walking would impact the identified light jobs, and the VE responded that those jobs would be precluded. *Id.*

## V. DISCUSSION

### A. The ALJ Improperly Considered the Opinion Evidence

Claimant contends that the ALJ erred by failing to evaluate the permanent limitations assessed by Dr. Burt, Claimant's treating physician, and by making an RFC finding that contradicts those limitations without explanation. Pl.'s Mem. [DE-17] at 8-12. In response, Defendant argues that the ALJ's decision is supported by substantial evidence and the ALJ actually adopted Dr. Burt's opinion, finding Claimant was more limited than Dr. Burt in some areas. Def.'s Mem. [DE-23] at 5-9. Further, Defendant argues that "[w]hile the ALJ did not give a reason for not relying on Dr. Burt's opinion, dated 16 month [sic] prior to the alleged disability period, to prove his RFC, the reason is clear. [Claimant] had two more surgeries going into the alleged period, so the only real question is what was her condition post recovery from those surgeries." *Id.* at 7.

The regulations require the ALJ to consider all evidence in the record when making a disability determination. 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3). Regardless of the source, the ALJ must evaluate every medical opinion received. *Id.* §§ 404.1527(c); 416.927(c). In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1); 416.927(c)(1). More weight is generally given to opinions of treating sources, who usually are most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability, than non-treating sources, such as consultative examiners. *Id.* §§ 404.1527(c)(2); 416.927(c)(2). Though the opinion of a treating physician is generally entitled to "great weight," the ALJ is not required to give it "controlling weight." *Craig*, 76 F.3d at 590. In

9

fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Id.*; *see also Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (stating "[t]he ALJ may choose to give less weight to the testimony of a treating physician if there is persuasive contrary evidence"); *Mastro*, 270 F.3d at 178 (explaining "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence") (citation omitted).

If the ALJ determines that a treating physician's opinion should not be considered controlling, the ALJ must then analyze and weigh all of the medical opinions in the record, taking into account the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist. *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (citing 20 C.F.R. § 404.1527). While an ALJ is under no obligation to accept any medical opinion, *see Wireman v. Barnhart*, No. 2:05-CV-46, 2006 WL 2565245, at *8 (W.D. Va. Sept. 5, 2006) (unpublished), he must nevertheless explain the weight afforded such opinions. *See* S.S.R. 96-2p, 1996 WL 374188, at *5 (July 2, 1996); S.S.R. 96-6p, 1996 WL 374180, at *1 (July 2, 1996). An ALJ may not reject medical evidence for the wrong reason or no reason. *Wireman*, 2006 WL 2565245, at *8. "In most cases, the ALJ's failure to consider a physician's opinion (particularly a treating physician) or to discuss the weight given to that opinion will require remand." *Love-Moore v. Colvin*, No. 7:12-CV-104-D, 2013 WL 5350870, at *2 (E.D.N.C. Sept. 24, 2013) (unpublished) (citations omitted). However, "[i]n some cases, the failure of an ALJ to explicitly state the weight given to a medical opinion constitutes harmless error, so long as the weight given to the opinion is discernible from the

decision and any grounds for discounting it are reasonably articulated." *Bryant v. Colvin*, No. 5:11-CV-648-D, 2013 WL 3455736, at *5 (E.D.N.C. July 9, 2013) (unpublished) (citations & quotations omitted).

Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [the claimant's] symptoms, diagnosis, and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2); 416.927(a)(2). "Only those statements . . . that reflect judgments regarding a claimant's prognosis or limitations, or the severity of symptoms," and not those which merely report subjective complaints of the claimant's pain, constitute medical opinions as defined in the regulations. *Love-Moore v. Colvin*, No. 7:12-CV-104-D, 2013 WL 5366967, at *11 (E.D.N.C. Aug. 30, 2013) (unpublished) (citations omitted), *adopted by* 2013 WL 5350870 (E.D.N.C. Sept. 24, 2013).

The opinion at issue here is recorded in the treatment notes of Dr. Burt, who performed two surgeries on Claimant's left knee: first on November 4, 2004, Dr. Burt performed an arthroscopy, debridement of the chondromalacia of the patella, and lateral release, then on November 11, 2005, Dr. Burt performed a patellectomy. (R. 352, 362). On June 14, 2006, while following up with Claimant after the patellectomy, Dr. Burt noted that Claimant could "resume activities as tolerated," and opined that Claimant had the following permanent restrictions in her left knee: "no kneeling, no squatting, and weight restriction would be up to 40 lbs of lifting." (R. 364). On August 2, 2006, Dr. Burt reiterated those permanent restrictions and further opined that "[i]n accordance with the North Carolina Industrial Commission guidelines, her Permanent Partial Disability Rating for that left knee

11

would be 20% of the left whole leg." (R. 366).

The ALJ discussed the record evidence relating to Claimant's knee surgeries in 2004 and 2005, stating:

> [t]he longitudinal medical record reveals that the claimant sustained a work-related injury to her left knee on August 26, 2004. She was seen by Mark Burt, M.D. of the Orthopaedic Specialists of North Carolina. He had an MRI of the knee performed in September 2004 that showed a full thickness chondral defect. On October 4, 2004, Dr. Burt performed arthroscopic surgery with debridement, chondroplasty, and lateral release. In June 2005, the claimant returned to see Dr. Burt and he diagnosed her with arthritis and chondromalacia in the left knee. Following a course of physical therapy, he determined that further surgery was needed. On November 11, 2005, he performed a left patellecttomy. Post-operatively, the claimant was released to full duty in June 2006. She was found to have a 20% permanent partial impairment.

(R. 34). The ALJ did not discuss, however, the permanent limitations of no kneeling or squatting, nor did he discuss how much weight was given to Dr. Burt's opinion. The ALJ went on to state that "[t]here are no treating or examining medical source statements in the record," and discussed the great weight given to the assessments of the non-examining state agency medical consultants. (R. 36).

As an initial matter, Dr. Burt's treatment notes imposing permanent restrictions of no kneeling or squatting "reflect judgments about the nature and severity of [Claimant's] impairment(s) . . . what [Claimant] can still do despite impairment(s), and [Claimant's] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2); 416.927(a)(2). Thus, Dr. Burt's statements constitute a medical opinion from a treating source, which the ALJ must consider along with all of the medical opinion evidence. *Id.* §§ 404.1527(c); 416.927(c). The permanent restrictions imposed by Dr. Burt directly conflict with the RFC assessed by the ALJ, which allows for occasional stooping and kneeling. (R. 32). Thus, where the limitations contained in Dr. Burt's opinion conflict with the

ALJ's RFC determination, the ALJ's failure to state the weight given to Dr. Burt's opinion is not harmless error, as the weight afforded the opinion is not discernible from the decision and the ALJ's grounds for discounting the opinion are not reasonably articulated. *Bryant*, 2013 WL 3455736, at *5. Further, Defendant's argument related to the fact that Dr. Burt's opinion predated the disability period is without merit. "Where evidence predating the onset of disability is relevant to an issue in the case, the ALJ should consider that evidence in making a determination on the issue." *Treadwell v. Colvin*, No. 5:13-CV-370-FL, 2014 WL 4656852, at *10 (E.D.N.C. Sept. 17, 2014) (unpublished) (citations omitted). As discussed above, the ALJ actually considered the medical evidence predating Claimant's onset date in this case, but failed to explain the weight afforded to Dr. Burt's opinion from this time period.

The ALJ should have explicitly weighed Dr. Burt's opinion in his decision, and his failure to do so requires remand. *See Radford v. Colvin*, 734 F.3d 288, 296 (4th Cir. 2013) ("Just as it is not our province to 'reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [ALJ],' . . . it is also not our province—nor the province of the district court—to engage in these exercises in the first instance.") (internal citation omitted). On remand, it is within the ALJ's discretion to accept or reject the opinion in whole or in part, so long as he clearly articulates valid reasons for so doing. Further, where an ALJ improperly fails to weigh such medical opinions and where those opinions are "integral in determining Claimant's RFC and credibility, the ALJ should reevaluate both his RFC and credibility determinations on remand." *Prather v. Colvin*, No. 5:12-CV-171-FL, 2013 WL 4806958 (E.D.N.C. Sept. 9, 2013) (unpublished) (citing S.S.R. 96-7p, 1996 WL 374186, at *1 (July 2, 1996); S.S.R. 96-8p, 1996 WL 374184, at *7 (July 2, 1996)). Therefore, the undersigned does not address Claimant's remaining RFC argument

13

Case 5:14-cv-00425-FL   Document 25   Filed 08/12/15   Page 13 of 15

as it is also recommended that the ALJ reconsider the RFC determination on remand.

## VI. CONCLUSION

For the reasons stated above, it is RECOMMENDED that Claimant's Motion for Judgment on the Pleadings [DE-16] be ALLOWED, Defendant's Motion for Judgment on the Pleadings [DE-22] be DENIED and the case be REMANDED to the Commissioner for further proceedings consistent with the Memorandum and Recommendation.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on each of the parties or, if represented, their counsel. Each party shall have until **August 26, 2015** to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his or her own review (that is, make a de novo determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C. Any response to objections shall be filed within **14 days** of the filing of the objections.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals**

14

from an order or judgment of the presiding district judge based on the Memorandum and Recommendation. *See Wright v. Collins*, 766 F.2d 841, 846-47 (4th Cir. 1985).

Submitted, this the 12 day of August, 2015.

/s/ Robert B. Jones, Jr.
Robert B. Jones, Jr.
United States Magistrate Judge